XHAVIN SINHA (SBN 309340)
Sinha Law
1645 Willow Street, #150
San Jose, CA 95125
Telephone: (408) 791-0432

xsinha@sinha-law.com

Attorney for Plaintiff
CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION, a California corporation,<br><br>    Plaintiff,<br><br>  vs.<br><br>WEST COAST METALS, a California corporation; JACK GARDNER, an individual; SHILOH ROAD, LLC, a California limited liability company; LYNN C. FRITZ, an individual; and DOES 1-10, inclusive,<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION

("CEPA") hereby brings this civil action pursuant to the Federal Water Pollution Control Act,

also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

## INTRODUCTION

1.      This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants WEST COAST METALS, JACK GARDNER, SHILOH ROAD LLC, and LYNN C. FRITZ for current, and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2.      On or about September 30, 2017, CEPA provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board"), (4) Executive Director of the North Coast Regional Water Quality Control Board ("Regional Board"), and (5) Defendants WEST COAST METALS and JACK GARDNER, as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      On or about January 9, 2018, CEPA provided a First Supplemental Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board"), (4) Executive Director of the North Coast Regional Water Quality Control Board ("Regional Board"), and (5) Defendants WEST COAST METALS, JACK GARDNER, SHILOH ROAD LLC and LYNN C. FRITZ, as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

4.      A copy of CEPA's Notices of Intent to Sue are attached hereto as Exhibit "A".

5.      More than sixty days have passed since CEPA's Notices were served on Defendants, the Regional Board, the State Board, and the Regional and National EPA Administrators.  CEPA is informed and believes, and thereupon alleges, that neither the National EPA nor the State of California has commenced or is diligently prosecuting a court action to

redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

7.      Venue is proper because Defendants reside in and the events or omissions giving rise to CEPA's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## PARTIES

8.      Plaintiff CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION ("CEPA") is an environmental membership organization incorporated under the laws of the State of California. Its members work to protect, enhance, and assist in the restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California. Members of CEPA reside and work near the Laguna de Santa Rosa and the Russian River, and use those waters and their watersheds for recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study. Their use and enjoyment of these natural resources are specifically impaired by defendant's violations of the CWA.

9.      Defendants' ongoing violations of the General Permit and the CWA will cause irreparable harm to CEPA and its members, for which they have no plain, speedy, or adequate remedy. The relief requested will redress the ongoing injury in fact to CEPA and its members.

10.     CEPA is informed and believes, and on such information and belief alleges, that Defendant JACK GARDNER is the President and CEO of Defendant WEST COAST METALS, INC, located at 470 Caletti Avenue, in Windsor, Sonoma County, California ("the Facility").

11.     Defendant WEST COAST METALS was formed on or about April 4, 1978 as a California corporation, and is identified in the Regional Board's records as the operator of the Facility. Defendant JACK GARDNER is identified as the Legally Responsible Person for the Facility in the documents on file with the Regional Board.

12.     CEPA is informed and believes, and on such information and belief alleges, that Defendant SHILOH ROAD LLC is the legal owner of the property located at 470 Caletti Avenue, Sonoma County, California, and is Defendant WEST COAST METALS' Lessor. Defendant LYNN C. FRITZ is identified in the records of the California Secretary of State as the Managing Member and the agent for service of process for SHILOH ROAD LLC.

13.     Plaintiff is informed and believes, and thereupon alleges, that Defendant SHILOH ROAD LLC had actual knowledge of Defendant WEST COAST METALS' violations of the General Permit and the CWA, coupled with sufficient control over Defendant WEST COAST METALS due to the terms of the lease between Defendant SHILOH ROAD LLC and Defendant WEST COAST METALS, but nevertheless failed to ensure that Defendant WEST COAST METALS complied with applicable environmental laws and ceased the General Permit and CWA violations complained of herein.

14.     Defendant WEST COAST METALS continued to violate the General Permit and the CWA after Defendant SHILOH ROAD LLC received Notice of Defendant WEST COAST METALS's violations, as evidenced by documents and records contained in the public database of the California Environmental Protection Agency, State Water Resources Control Board's Storm Water Multiple Application and Report Tracking System (SMARTS).

## STATUTORY BACKGROUND

15.     Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

16.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

17.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

18.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

General Permit

19.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

20.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

21.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

22.     Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the

environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

23.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

24.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

25.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X(B).

26.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet § I(1).

27.     Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

28.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

29.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, § X(H)(4), (5).

30.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

31.     As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

32.     Section XI(B) of the General Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

33.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit Section XI(B)(2)

34.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit §XI(B)(4)

35.     Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, § XI.A.

36.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV.

37.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, § XI(B)(6)(c).

38.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

39.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks.  The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

40.     The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L; iron – 1.0 mg/L, zinc (.26 mg/L), aluminum – .75 mg/L; lead – .262 mg/L; and chemical oxygen demand – 120 mg/L.

41.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single

parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH. General Permit §XII(A)

42.    When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status." General Permit § XII(C)

43.    For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background. General Permit §XII(D)

44.    Section XVI(A) of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

45.    Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation." 33 U.S.C. §1365(a)(1). No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A). By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

46.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d). 33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation." 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

47.     Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

### FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

48.     Defendant WEST COAST METALS is a waste and scrap metals recycling facility. CEPA is informed and believes that the Facility falls under standard industrial classification ("SIC") code 5093, Scrap and Waste Metals.

49.     CEPA is informed and believes that WEST COAST METALS stores large quantities of industrial materials outdoors in piles that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

50.     Based on CEPA's investigation, including a review of the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, and CEPA's information and belief, storm water is collected and discharged from the Facility through a series of channels that discharge via at least one outfall. The outfall discharges storm water and pollutants contained in that storm water into Pruitt Creek, which flows to the Laguna de Santa Rosa and then into the Russian River.

51.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur, including sorting and storing waste and scrap metals, and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground.   Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water channels.

52.     On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

53.     On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facility. Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

54.     The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants. The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated. The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

Deficient SWPPP/Failure to Update SWPPP

55.     On information and belief, Plaintiff alleges that since at least January 25, 2017, Defendant has failed to implement an adequate SWPPP for the Facility.

56.     Plaintiff is informed and believes, and thereupon alleges, that the Facility's current SWPPP dated August 13, 2015 fails to set forth the site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.

57.     Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not comply with the requirements of Section X(G)(1)(e), X(G)(2), and X(H) of the General Permit.

58.     According to information available to CEPA, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit.

59.     Specifically, Defendant has failed to upload an amended SWPPP to incorporate additional BMPs recommended by its SWPPP in the Facility's Level 1 ERA Report dated January 25, 2017, in violation of Section XII(C)(2) of the General Permit.

60.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

61.     In addition, Plaintiff alleges that Defendant WEST COAST METALS has failed to comply with the provisions of its current SWPPP in the areas of monitoring and reporting as provided by the SWPPP.

62.     Information available to CEPA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into Pruitt Creek, which flows to the Russian River.

63.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water. Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

<u>Monitoring and Reporting</u>

64.     On information and belief, CEPA alleges that WEST COAST METALS has no current monitoring program at its Facility.

65.     On information and belief, CEPA alleges that during the 2017-2018 reporting year to date, WEST COAST METALS has failed to collect and analyze any storm water samples at its Facility and has not collected and analyzed storm water samples since March 20, 2017.

66.     On information and belief, CEPA alleges that WEST COAST METALS failed to conduct monthly visual observations of storm water discharges during the following months: April through December of 2017; and January through April of 2018.

67.     On information and belief, CEPA alleges that WEST COAST METALS has taken samples of storm water discharges at the Facility that failed to comply with the General Permit's requirement that samples be preceded by a period without a discharge.  Specifically, CEPA alleges that the following sampling dates were not preceded by the required period without a discharge: March 6, 2017.

<u>Failure to Implement BAT/BCT and BMPs</u>

68.     CEPA is informed and believes that WEST COAST METALS has failed to identify and implement Best Management Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These

technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.  General Permit §§ I(C), V(A).

69.    Specifically, a Qualified Industrial Stormwater Practitioner ("QISP") hired by WEST COAST METALS to evaluate the Facility after WEST COAST METALS entered Level 1 status noted the following continuing BMP deficiencies in a report dated January 25, 2017: (a) Good Housekeeping:  Old unused, and partially rusted process equipment, materials, and recycled metals stored onsite, uncovered (exposed); small bins of aluminum and other metal shavings, drill tailings stored outside uncovered in bins with not completely intact bottoms; (b) Material Handling:  Recycled ferrous and non-ferrous metals stored and manipulated on exposed soils; metals to be recycled not completely under cover or in containment that allows for coverage during storm events; and (c) Erosion and Sediment Controls:  WEST COAST METALS has failed to divert storm water runoff away from recycled metals storage or minimize heaving equipment driving over exposed soils.

70.    Furthermore, members of CEPA have visited the Facility numerous times since September 1, 2017, and have confirmed the lack of appropriate BMPs at the Facility, as well as the presence of enormous piles of uncovered scrap metals exposed to the elements.

71.    Information available to CEPA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to Pruitt Creek, a tributary of the Russian River.

Discharges of Contaminated Storm Water

72.    Defendant WEST COAST METALS has taken samples or arranged for samples to be taken of storm water discharges at its Facility.  The sample results were reported in the

Facility's Annual Reports submitted to the Regional Board. Defendant certified each of those Annual Reports pursuant to the General Permit.

73.     In Annual Reports and storm water sampling results submitted to the Regional Board for the 2015-16 and 2016-17 reporting years, the Facility has consistently reported high pollutant levels from its storm water sampling results.

74.     In addition, the Facility has reported discharges in excess of narrative and numeric water quality standards established in the North Coast Regional Basin Plan. These observations have thus violated narrative and numeric water quality standards established in the Basin Plan and have thus violated Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the General Permit; and are evidence of ongoing violations of Effluent Limitation V(A) of the Permit.

75.     The levels of Aluminum in storm water detected by the Facility have exceeded the WQO established by the Basin Plan of 1.0 mg/L for Aluminum.    For example, on December 14, 2016, the Aluminum level at the facility was measured at 6.2 mg/L. That level is six times the WQO for Aluminum.    Defendant also has measured levels of Aluminum in excess of 1.0 mg/L in storm water discharged from the facility on January 13, 2016 and March 6, 2017.

76.     The levels of Iron in storm water detected by the Facility have exceeded the benchmark value and annual NAL for Iron of 1 mg/L established by EPA and the State Board, respectively.  For example, on March 6, 2017, the Iron level at the facility was measured at 9.3 mg/L. That level is over nine times the benchmark value and annual NAL for Iron.   Defendant also has measured levels of Iron in excess of 1 mg/L in storm water discharged from the facility on January 13, 2016, November 23, 2016, and December 14, 2016.

77.     The levels of Zinc in storm water detected by the Facility have exceeded the benchmark value and annual NAL for Zinc of .26 mg/L established by EPA and the State Board, respectively.  For example, on December 14, 2016, the Zinc level at the facility was measured at 2.3 mg/L.  That level is more than eight times the benchmark value and annual NAL for Zinc. Defendant also has measured levels of Zinc in excess of .26 mg/L in storm water discharged from the facility on March 6, 2017.

78.     The Facility did not sample and analyze any storm water run-off after March 20, 2017.

<u>Failure to Comply with Required Exceedance Response Actions</u>

79.     On July 1, 2017, WEST COAST METALS was elevated to Level 2 Status for exceedances of Aluminum and Iron.

80.     Pursuant to Section XII of the General Permit, WEST COAST METALS' Level 2 Action Plan was due to be prepared and uploaded into SMARTS by January 1, 2018.

81.     To date, WEST COAST METALS has failed to submit a Level 2 ERA Action Plan.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

82.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

83.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

84.     As outlined herein, Defendant WEST COAST METALS has failed to develop and implement an adequate SWPPP for the Facility.

85.     Each day since January 25, 2017, that Defendant WEST COAST METALS has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

86.     Defendants have been in violation of the SWPPP requirements every day since January 25, 2017, and continue to be in violation of the SWPPP requirements each day that Defendant WEST COAST METALS fails to develop and fully implement an adequate SWPPP for its Facility.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

87.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

88.     The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

89.     As outlined herein, Defendant WEST COAST METALS has failed to develop and implement an adequate monitoring and reporting program for its Facility.

90.     Defendant WEST COAST METALS' ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by its failure to collect storm water samples pursuant to the requirements of the General Permit.

91.     Each day since at least April 1, 2017, that Defendant WEST COAST METALS has failed to develop and implement an adequate monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General

Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants. The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

92.     Noncompliance with the General Permit constitutes a violation of the CWA against all Defendants. General Permit § XXI.A; 33 U.S.C. § 1342.

**THIRD CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

93.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

94.     The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

95.     Defendant WEST COAST METALS has failed to implement BAT and BCT at its Facility for its discharges of Iron, TSS, Zinc, Aluminum, Lead, and other potentially un-monitored pollutants, in violation of Effluent Limitation V(A) of the General Permit.

96.     Each day since at least January 25, 2017, that Defendant WEST COAST METALS has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

97.     Defendants have been in violation of the BAT/BCT requirements every day since at least January 25, 2017, and continue to be in violation of the BAT/BCT requirements each day that Defendant WEST COAST METALS fails to develop and fully implement BAT/BCT at the Facility.

### FOURTH CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

98.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

99.     Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

100.     Plaintiff is informed and believes, and thereupon alleges, that since at least January 13, 2016, Defendant WEST COAST METALS has been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

101.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at its Facility, becoming contaminated with iron, sediment, zinc, aluminum, lead and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated into Pruitt Creek, which flows to the Russian River.

102.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water

quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

103.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

104.    Every day since at least January 13, 2016, that Defendant WEST COAST METALS has discharged and continues to discharge polluted storm water from its Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.  These violations are ongoing and continuous.

**FIFTH CAUSE OF ACTION**
**Failure to Comply with Required Exceedance Response Actions**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

105.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

106.    The General Permit requires that all Dischargers who enter Level 1 or Level 2 status comply with specific Exceedance Response Actions delineated in Section XII of the General Permit.

107.    On July 1, 2017, WEST COAST METALS entered Level 2 status.

108.    As herein alleged, WEST COAST METALS has failed to date to comply with the Exceedance Response Actions required of it by the General Permit.

109.    Each day since January 1, 2018, that Defendant has failed to comply with the Exceedance Response Actions required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.      Declare Defendants to have violated and to be in violation of the CWA;

2.      Issue an injunction ordering Defendants to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.      Enjoin Defendants from discharging pollutants from Defendant WEST COAST METALS' Facility to the surface waters surrounding the Facility until such time as WEST COAST METALS has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.      Order Defendants to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.      Order Defendants to take appropriate actions to restore the quality of United States waters impaired by its activities at WEST COAST METALS's Facility;

6.      Order Defendants to pay CEPA's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

7.      Award such other and further relief as may be just and proper.

Dated:  May 21, 2018                                 Respectfully,



By:  _/S/ Xhavin Sinha_
     Xhavin Sinha
     Attorney for Plaintiff

EXHIBIT A



1645 Willow Street, Suite 150<br>
San Jose, CA 95125<br>
408.791.0432 (voice)<br>
www.sinha-law.com

September 30, 2017

<u>Via Hand Delivery</u>

Jack Gardner, owner
Martin Zamudio, Site Manager
West Coast Metals
470 Caletti Avenue
Windsor, CA  95492

<u>Via US Mail</u>

Jack Gardner
West Coast Metals
PO Box 791
Windsor, CA  95492

**Re:     60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of West Coast Metals:

The California Environmental Protection Association ("CEPA") provides this 60-day Notice of violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that CEPA believes are occurring at the West Coast Metals facility located at 470 Caletti Avenue in Windsor, California ("the Facility" or "the site").  Pursuant to CWA §505(b) (33 U.S.C. §1365(a)), this 60-day Notice of violations ("Notice") is being sent to you as the responsible property owners, officers, operators or managers of the Facility, as well as to the U.S. Environmental Protection Agency ("EPA"), the U.S. Attorney General, the California State Water Resources Control Board ("SWRCB"), and the California North Coast Regional Water Quality Control Board ("RWQCB").

CEPA is a Sonoma County-based environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, wetlands, vernal pools, and tributaries of California.

This Notice addresses the violations of the CWA and the terms of California's Statewide General Permit for Dischargers of Storm Water for Industrial Activities ("General Permit") arising



from the unlawful discharge of pollutants from the Facility into Pruitt Creek, a tributary of the Russian River (which is listed as impaired for sediment, temperature, and bacteria under CWA §303(d)).

West Coast Metals (the "Discharger") is hereby placed on formal notice by CEPA that after the expiration of sixty (60) days from the date this Notice was delivered, CEPA will be entitled to bring suit in the United States District Court against the Discharger for continuing violations of an effluent standard or limitation, National Pollutant Discharge Elimination System ("NPDES") permit condition or requirement, or Federal or State Order issued under the CWA (in particular, but not limited to, § 301(a), § 402(p), and § 505(a)(1)), as well as the failure to comply with requirements set forth in the Code of Federal Regulations and the North Coast RWQCB Water Quality Control Plan or "Basin Plan".

## I.       THE SPECIFIC STANDARD, LIMITATION, OR ORDER VIOLATED

The Discharger filed a Notice of Intent ("NOI") on June 9, 2015, with respect to the Facility, agreeing to comply with the terms and conditions of the General Permit. The SWRCB approved the NOI, and the Discharger was assigned Waste Discharger Identification ("WDID") number 1 49I018939.

However, in its operations of the Facility, the Discharger has failed and is failing to comply with specific terms and conditions of the General Permit as described in Section II below. These violations are continuing in nature. Violations of the General Permit are violations of the CWA, specifically CWA § 301(a) and CWA § 402(p). Therefore, the Discharger has committed ongoing violations of the substantive and procedural requirements of CWA § 402(p) and of NPDES Permit No. CAS000001, State Water Resources Control Board Order 2014-0057-DWQ (the "General Permit") relating to industrial activities at the Facility.

## II.      VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A.  Facility Operations

West Coast Metals is a waste and scrap metals recycling facility. Site operations are covered under Standard Industrial Code ("SIC") 5093, Scrap and Waste Materials.

Site operations take place primarily outdoors on a site that slopes towards storm drains which eventually enter the navigable waters of the Laguna de Santa Rosa and the Russian River, all of which are in proximity to the Facility. Because the real property on which the Facility is located is subject to rain events, the range of pollutants discharged from the Facility and identified in this Notice can discharge to the Laguna de Santa Rosa and the Russian River.



B. <u>West Coast Metals' Specific Violations</u>

1. *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.

West Coast Metals has violated and continues to violate the terms and conditions of the General Permit by failing to implement minimum and/or advanced BMPs that utilize BAT and BCT to control the discharge of pollutants in storm water at the Facility.

On July 1, 2016, the Discharger was accelerated to Level 1 Status pursuant to Section XII.C of the General Permit, for exceedances of Iron and Aluminum.  Pursuant to the General Permit, the Facility was evaluated on October 11, 2016, and a Level 1 Exceedance Response Evaluation Report was completed and certified on January 25, 2017.

The October 2016 evaluation completed by GP Environmental Solutions noted the following deficiencies in BMP implementation at the site:

1.  <u>Good Housekeeping:</u> *Old unused, and partially rusted process equipment, materials, and recycled metals stored onsite, uncovered (exposed); small bins of aluminum and other metal shavings, drill tailings stored outside uncovered in bins with not completely intact bottoms.*

2.  <u>Material Handling</u>: *Recycled ferrous and no-ferrous metals stored and manipulated on exposed soils; Metals to be recycled not completely under cover or in containment that allows for coverage during storm events.*

3.  <u>Erosion and Sediment Controls</u>: [Discharger needs to] *divert stormwater runoff away from recycled metals storage. Minimize heavy equipment driving over exposed soils.*

On July 1, 2017, the Discharger was accelerated to Level 2 Status pursuant to Section XII.D of the General Permit which provides as follows: "A Discharger's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1." The acceleration to Level 2 status was precipitated by average levels of Aluminum and Iron from the Discharger's sampling



results taken during Fiscal Year 2016-2017; specifically, on November 23, 2016, December 14, 2016, March 6, 2017 and March 20, 2017.   Furthermore, the Discharger was elevated to Level 1 Status for Fiscal Year 2016-2017 for Zinc.  (See Section 3 below)

The Discharger's continued exceedances are further evidence of its failure to correct its BMP deficiencies and to follow the recommendations in its Level 1 ERA Evaluation Report.

2.    *Failure to Update SWPPP*

Pursuant to Section XII.C.2.a of the General Permit, a Discharger shall "as soon as practicable but no later than January 1 following commencement of Level 1 status: i. Revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation."

The Discharger's January 25, 2017, Level 1 ERA Report identified the following issues with the Facility's current SWPPP it uploaded on August 13, 2015:

Based on the pollutant source evaluation and evaluation of existing BMPs implemented at the site, the following additional BMPs or improvements to existing BMPs will be implemented to control pollutants generated from on-site industrial activities. The SWPPP for the site will be revised to reflect the additional BMPs identified below.

| Additional BMP (to reduce Iron/Aluminum) | Date | SWPP Section |
|---|---|---|
| *Divert stormwater runoff away from internal roads and metals storage piles by re-grading soil surfaces.* | *October 21, 2016* | *Section 3* |
| *Addition of large diameter road base rock to all exposed soil surfaces where industrial activities occur to minimize sediment and silt exposure to runoff.* | *October 28, 2016* | *Section 3* |
| *Perform sediment cleanout maintenance of StormFilter Vault and Secondary Settling Vault. Inspect filter cartridges to evaluate need for media replacement.* | *October 28, 2016* | *Section 3* |
| *Remove old rusty equipment and materials or protect from stormwater exposure.* | *October 28, 2016 Ongoing as feasible* | *Section 3* |


**S I N H A**
**L A W**

| Additional BMP to reduce Iron/Aluminum | Date | SWPPP Section |
|---|---|---|
| *Store grindings, shavings, and small particle size metals in solid bins under covered areas.* | *October 14, 2016* | *Section 3* |
| *Replace mesh coverings over three (3) DI grates, encircle DI's with fiber rolls and petroleum hydrocarbon specific rolls. Secure in place with outer ring of washed base rock to act as pre-filter and ensure water cannot go under layers of rolls.* | *November 4, 2016* | *Section 3* |

As of the date of this Notice, the Discharger has failed to update its SWPPP according to the requirements of the General Permit.

### 3.  Failure to File a Complete Annual Report

Pursuant to Section XVI.B of the General Permit, the Annual Report must contain the following elements:  (a) a Compliance Checklist that indicates whether the Discharger has complied with and addressed all applicable requirements of the General Permit; (b) an explanation for any non-compliance with requirements within the reporting year, as indicated in the Compliance Checklist; (c) an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year; and (d) the date(s) of the required Annual Evaluation.

West Coast Metals' Annual Report uploaded into the SMARTS database system on July 13, 2017, for the reporting year ending June 30, 2017, was nothing more than a cover page and was missing all the above required elements.

### 4.  Discharges in Violation of the General Permit

Section 402(p) of the Clean Water Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit such as the General Permit. 33 U.S.C. § 1342.   Sections I.C.27 and III.A and B of the General Permit prohibit the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States. Section XXI.A of the General Permit requires Dischargers to comply with effluent standards or prohibitions established under section CWA 307(a) for toxic pollutants within the time provided in the regulations that establish these standards or prohibitions.

Sections III and VI of the General Permit prohibit storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment; cause or threaten to cause pollution, contamination, or nuisance; cause or contribute



to an exceedance of any applicable water quality standards in any affected receiving water; violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans) or statewide water quality control plans and policies; or contain hazardous substances equal to or in excess of a reportable quantity listed in 40 Code of Federal Regulations sections 110.6, 117.21, or 302.6.

West Coast Metals' sampling and analysis results reported to the RWQCB confirm discharges of specific pollutants and materials other than storm water, in violation of the General Permit provisions listed above. Self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil,* 813 F.2d 1480, 1492 (9th Cir. 1988).

Table 2 of the General Permit (TABLE 2: *Parameter NAL Values, Test Methods, and Reporting Units*) outlines specific Annual and Instantaneous Numeric Action Levels ("NALs) for common parameters. A copy of Table 2 is included with this Notice.

West Coast Metals' storm water analyses as indicated below contained levels for tested parameters in excess of Annual or Instantaneous NAL levels. The discharges of pollutants from the Facility have violated Discharge Prohibitions and Receiving Water Limitations of the General Permit and are evidence of ongoing violations of Effluent Limitations.

| Date of Sample Collection | Drainage Collection Point | Parameter | Concentration in Discharge (mg/L) | NAL Annual Average Value (mg/L) |
|---|---|---|---|---|
| 01/13/16 | WC1 | Iron | 5.4 | 1.0 |
| 01/13/16 | WC1 | Aluminum | 2.9 | 0.75 |
| 11/23/16 | WC1 | Iron | 1.2 | 1.0 |
| 12/14/16 | WC1 | Iron | 17 | 1.0 |
| 12/14/16 | WC1 | Aluminum | 6.2 | 0.75 |
| 12/14/16 | WC1 | Zinc | 2.3 | 0.26 |
| 03/06/17 | WC1 | Iron | 9.3 | 1.0 |
| 03/06/17 | WC1 | Aluminum | 3.7 | 0.75 |
| 03/06/17 | WC1 | Zinc | 0.78 | 0.26 |

The Discharger may have had other violations that can only be fully identified and documented once discovery and investigation have been completed. Hence, to the extent possible, CEPA includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

The violations discussed herein are derived from eye witness reports and records publicly available. These violations are continuing.



The Facility is located near Pruitt Creek, which is a tributary of both the Laguna de Santa Rosa and the Russian River – all waters of the United States.  The Russian River is listed under the CWA as impaired for Nutrients (D.O., Nitrogen, Phosphorous), Pathogens (Indicator Bacteria), Metals (Mercury), Misc. (Temperature), and Sediment (Siltation). Receiving water concerns for the Facility are nitrogen, zinc, aluminum, lead, iron, chemical oxygen demand, phosphorous and sediment. All illegal discharges and activities described in this Notice occur in close proximity to the above-identified waters.  During storm events, the discharges are highly likely to discharge to said waters.

The RWQCB has determined that the watershed areas and affected waterways identified in this Notice are beneficially used for: water contact recreation, non-contact water recreation, fish and wildlife habitat, preservation of rare and endangered species, fish migration, fish spawning, navigation, and sport fishing. Information available to CEPA indicates the continuation of unlawful discharges of pollutants from the Facility into waters of the United States, specifically the Laguna de Santa Rosa and the Russian River, in violation of the General Permit and the CWA. CEPA is informed and believes, and on such information and belief alleges, that these illegal discharges will continue to harm beneficial uses of the above-identified waters until the Discharger corrects the violations outlined in this Notice.

## III.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The entity responsible for the alleged violations is West Coast Metals ("the Discharger"), including its parent companies, owners, operators and employees responsible for compliance with the CWA.

## IV.    THE LOCATION OF THE VIOLATIONS

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is West Coast Metals' permanent facility address of 470 Caletti Avenue in Windsor, California, and includes the adjoining navigable waters of the Laguna de Santa Rosa and the Russian River, respectively - both waters of the United States.

## V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is from at least January 13, 2016, to the date of this Notice.  CEPA may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.


**S I N H A**
**L A W**

## VI.   CONTACT INFORMATION

The entity giving this 60-day Notice is the California Environmental Protection Association ("CEPA").

To ensure proper response to this Notice, all communications should be addressed as follows:

> *Xhavin Sinha, Attorney for*
> *CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION*
> *1645 Willow Street, #150*
> *San Jose, CA  95125*
> *Telephone: (408) 791-0432*
> *Email:* xsinha@sinha-law.com

## VII.   PENALTIES

The violations set forth in this Notice affect the health and enjoyment of members of CEPA who reside near and recreate in the Laguna de Santa Rosa watershed and the Russian River. Members of CEPA use the watershed and the Russian River for recreation, sports, fishing, swimming, hiking, photography, nature walks and the like. Their health, use and enjoyment of this natural resource is specifically impaired by the Discharger's violations of the CWA as set forth in this Notice.

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).  An action for injunctive relief under the CWA is authorized by 33 U.S.C. §1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day/per violation for all violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  See also 40 C.F.R. §§ 19.1-19.4.

CEPA believes this Notice sufficiently states grounds for filing suit in federal court under the "citizen suit" provisions of CWA to obtain the relief provided for under the law.



## VIII.   CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. CEPA encourages the Discharger and/or its counsel to contact CEPA or its counsel within 20 days of receipt of this Notice to initiate a discussion regarding the violations detailed herein.

During the 60-day notice period, CEPA is willing to discuss effective remedies for the violations, however, if the Discharger wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.  CEPA reserves the right to file a lawsuit if discussions are continuing when the notice period ends.

Very truly yours,

Xhavin Sinha
Attorney for CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION

Enclosure

TABLE 2 – Parameter NAL Values, Test Methods and Reporting Units



Copies to:


Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460


Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100


Jeff Sessions, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001


Regional Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105


Executive Officer
North Coast Regional Water Quality Control Board
5550 Skylane Boulevard, Suite A
Santa Rosa, CA 95403

Industrial General Permit Order

**TABLE 2:** Parameter NAL Values, Test Methods, and Reporting Units

| PARAMETER | TEST METHOD | REPORTING UNITS | ANNUAL NAL | INSTANTANEOUS MAXIMUM NAL |
|---|---|---|---|---|
| pH* | See Section XI.C.2 | pH units | N/A | Less than 6.0 Greater than 9.0 |
| Suspended Solids (TSS)*, Total | SM 2540-D | mg/L | 100 | 400 |
| Oil & Grease (O&G)*, Total | EPA 1664A | mg/L | 15 | 25 |
| Zinc, Total (H) | EPA 200.8 | mg/L | 0.26** | |
| Copper, Total (H) | EPA 200.8 | mg/L | 0.0332** | |
| Cyanide, Total | SM 4500–CN C, D, or E | mg/L | 0.022 | |
| Lead, Total (H) | EPA 200.8 | mg/L | 0.262** | |
| Chemical Oxygen Demand (COD) | SM 5220C | mg/L | 120 | |
| Aluminum, Total | EPA 200.8 | mg/L | 0.75 | |
| Iron, Total | EPA 200.7 | mg/L | 1.0 | |
| Nitrate + Nitrite Nitrogen | SM 4500-NO3- E | mg/L as N | 0.68 | |
| Total Phosphorus | SM 4500-P B+E | mg/L as P | 2.0 | |
| Ammonia (as N) | SM 4500-NH3 B+ C or E | mg/L | 2.14 | |
| Magnesium, total | EPA 200.7 | mg/L | 0.064 | |
| Arsenic, Total (c) | EPA 200.8 | mg/L | 0.15 | |
| Cadmium, Total (H) | EPA 200.8 | mg/L | 0.0053** | |
| Nickel, Total (H) | EPA 200.8 | mg/l | 1.02** | |
| Mercury, Total | EPA 245.1 | mg/L | 0.0014 | |
| Selenium, Total | EPA 200.8 | mg/L | 0.005 | |
| Silver, Total (H) | EPA 200.8 | mg/L | 0.0183** | |
| Biochemical Oxygen Demand (BOD) | SM 5210B | mg/L | 30 | |

SM – Standard Methods for the Examination of Water and Wastewater, 18th edition
EPA – U.S. EPA test methods
(H) – Hardness dependent
* Minimum parameters required by this General Permit
**The NAL is the highest value used by U.S. EPA based on their hardness table in the 2008 MSGP.



1645 Willow Street, Suite 150
San Jose, CA 95125
408.791.0432 (voice)
www.sinha-law.com

January 9, 2018


<u>Via Email</u>

C. Scott Kirk
Attorney at Law
111 Santa Rosa Avenue, Ste 405
Santa Rosa, CA 95404-4947
Email: scott@cscottkirk.com

<u>Via US Mail</u>

Lynn C. Fritz
Shiloh Road, LLC
PO Box 389
Graton, CA  95444

Linda Tauzer
Agent for Service of Process for
Shiloh Road, LLC
3171 Ross Road #389
Graton, CA  95444

Jack Gardner
West Coast Metals
PO Box 791
Windsor, CA  95492


**Re:    First Amended 60-Day Notice of Violations and Intent to File Suit Under the
Federal Water Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of West Coast
Metals:



The California Environmental Protection Association ("CEPA") provides this 60-day Notice of violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that CEPA believes are occurring at the West Coast Metals facility located at 470 Caletti Avenue in Windsor, California ("the Facility" or "the site"). This Notice amends the prior Notice dated September 30, 2017.

Pursuant to CWA §505(b) (33 U.S.C. §1365(a)), this 60-Day Notice of violations ("Notice") is being sent to you as the responsible property owners, officers, operators or managers of the Facility, as well as to the U.S. Environmental Protection Agency ("EPA"), the U.S. Attorney General, the California State Water Resources Control Board ("SWRCB"), and the California North Coast Regional Water Quality Control Board ("RWQCB").

CEPA is a Sonoma County-based environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, wetlands, vernal pools, and tributaries of California.

This Notice addresses the violations of the CWA and the terms of California's Statewide General Permit for Dischargers of Storm Water for Industrial Activities ("General Permit") arising from the unlawful discharge of pollutants from the Facility into Pruitt Creek, a tributary of the Russian River (which is listed as impaired for sediment, temperature, and bacteria under CWA §303(d)).

West Coast Metals (the "Discharger") and Shiloh Road, LLC (the "Property Owner") are hereby placed on formal notice by CEPA that after the expiration of sixty (60) days from the date this Notice was delivered, CEPA will be entitled to bring suit in the United States District Court against the Discharger and the Property Owner for continuing violations of an effluent standard or limitation, National Pollutant Discharge Elimination System ("NPDES") permit condition or requirement, or Federal or State Order issued under the CWA (in particular, but not limited to, §301(a), § 402(p), and § 505(a)(1)), as well as the failure to comply with requirements set forth in the Code of Federal Regulations and the North Coast RWQCB Water Quality Control Plan or "Basin Plan".

## I.      THE SPECIFIC STANDARD, LIMITATION, OR ORDER VIOLATED

The Discharger filed a Notice of Intent ("NOI") on June 9, 2015, with respect to the Facility, agreeing to comply with the terms and conditions of the General Permit.  The SWRCB approved the NOI, and the Discharger was assigned Waste Discharger Identification ("WDID") number 1 49I018939.



However, in its operations of the Facility, the Discharger has failed and is failing to comply with specific terms and conditions of the General Permit as described in Section II below. These violations are continuing in nature. Violations of the General Permit are violations of the CWA, specifically CWA § 301(a) and CWA § 402(p). Therefore, the Discharger has committed ongoing violations of the substantive and procedural requirements of CWA § 402(p) and of NPDES Permit No. CAS000001, State Water Resources Control Board Order 2014-0057-DWQ (the "General Permit") relating to industrial activities at the Facility.

## II.   VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A. Facility Operations

West Coast Metals is a waste and scrap metals recycling facility. Site operations are covered under Standard Industrial Code ("SIC") 5093, Scrap and Waste Materials.

Site operations take place primarily outdoors on a site that slopes towards storm drains which eventually enter the navigable waters of the Laguna de Santa Rosa and the Russian River, all of which are in proximity to the Facility. Because the real property on which the Facility is located is subject to rain events, the range of pollutants discharged from the Facility and identified in this Notice can discharge to the Laguna de Santa Rosa and the Russian River.

### B. West Coast Metals' Specific Violations

*1. Failure to Collect and Analyze Storm Water Samples Pursuant to the General Permit*

#### a.   Failure to Collect Samples from Four QSEs during Fiscal Year 2016-17

The Discharger has failed to provide the RWQCB with the minimum number of annual documented results of facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

A Qualifying Storm Event (QSE) is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.



Furthermore, Section XI.B.11.a requires Dischargers to submit all sampling and analytical results for all individual or Qualified Combined Samples via SMARTS within 30 days of obtaining all results for each sampling event.  Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, an explanation must be included in the Annual Report.

As of the date of this Notice, the Discharger has failed to upload into the SMARTS database system:

a.      Two storm water sample analyses for the time period July 1, 2017, through December 31, 2017.  Qualified Storm Events occurred in the vicinity of the Facility on at least the following relevant dates: 10/19/17, 11/3/17, 11/8/17, 11/13/17, 11/15/17, 11/20/17 and 11/26/17.

Further, the Discharger has not applied for or received a No Exposure Certification (NEC) for the facility, pursuant to Section XVII, which provides as follows:

**XVII. CONDITIONAL EXCLUSION - NO EXPOSURE CERTIFICATION (NEC)**
**A.** Discharges composed entirely of storm water that has not been exposed to industrial activity are not industrial storm water discharges. Dischargers are conditionally excluded from complying with the SWPPP and monitoring requirements of this General Permit if all of the following conditions are met:

1. There is no exposure of Industrial Materials and Activities to rain, snow, snowmelt, and/or runoff;

2. All unauthorized NSWDs have been eliminated and all authorized NSWDs meet the conditions of Section IV;

3. The Discharger has certified and submitted via SMARTS PRDs for NEC coverage pursuant to the instructions in Section II.B.2; and,

4. The Discharger has satisfied all other requirements of this Section.

b.      <u>Failure to Provide Storm Water Run-Off Samples during Qualified Storm Events</u>

Pursuant to Section XI.B.1 of the General Permit, a Qualified Storm Event is a precipitation event that both produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.

The Discharger's sample collected on March 6, 2017, is invalid because it was not collected during a Qualified Storm Event as defined by the General Permit.  Specifically, the March 6, 2017, sample was taken on the third consecutive day of rainfall.



c.   Failure to Upload Sample Analytical Reports to SMARTS within 30 days

Section XI.B.11.a of the General Permit provides that "Dischargers shall submit all sampling and analytical results for all individual or Qualified Combined Samples via SMARTS within 30 days of obtaining all results for each sampling event."

West Coast Metals failed to upload into SMARTS within 30 days its analytical reports from Analytical Sciences in Petaluma for its storm water samples collected on the following dates:

| Sample Date | Approximate Date Report Received | Date uploaded into SMARTS |
|---|---|---|
| 12/30/15 | 01/21/16 | 04/15/16 |
| 01/13/16 | 02/01/16 | 04/15/16 |
| 02/24/16 | 03/03/16 | 04/15/16 |
| 12/14/16 | 01/16/17 | 05/16/17 |
| 03/06/17 | 04/03/17 | 05/16/17 |

2.   *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.

West Coast Metals has violated and continues to violate the terms and conditions of the General Permit by failing to implement minimum and/or advanced BMPs that utilize BAT and BCT to control the discharge of pollutants in storm water at the Facility.

On July 1, 2016, the Discharger was accelerated to Level 1 Status pursuant to Section XII.C of the General Permit, for exceedances of Iron and Aluminum.  Pursuant to the General Permit, the facility was evaluated on October 11, 2016, and a Level 1 Exceedance Response Evaluation Report was completed and certified on January 25, 2017.

The October 2016 evaluation completed by GP Environmental Solutions noted the following deficiencies in BMP implementation at the site:

1.   Good Housekeeping: - *Old unused, and partially rusted process equipment, materials, and recycled metals stored onsite, uncovered (exposed); small bins of aluminum and other metal shavings, drill tailings stored outside uncovered in bins with not completely intact bottoms.*



2. <u>Material Handling</u>:  ***Recycled ferrous and no-ferrous metals stored and manipulated on exposed soils; Metals to be recycled not completely under cover or in containment that allows for coverage during storm events.***

3. <u>Erosion and Sediment Controls</u>:  [Discharger needs to] ***divert stormwater runoff away from recycled metals storage. Minimize heavy equipment driving over exposed soils.***

On July 1, 2017, the Discharger was accelerated to Level 2 Status pursuant to Section XII.D of the General Permit which provides as follows: "A Discharger's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1." The acceleration to Level 2 status was precipitated by average levels of Aluminum and Iron from the Discharger's sampling results taken during Fiscal Year 2016-2017; specifically, on November 23, 2016, December 14, 2016, March 6, 2017 and March 20, 2017.   Furthermore, the Discharger was elevated to Level 1 Status for Fiscal Year 2016-2017 for Zinc.  (See Section 3 below)

The Discharger's continued exceedances are further evidence of its failure to correct its BMP deficiencies and to follow the recommendations in its Level 1 ERA Evaluation Report.

On January 3, 2018, a CEPA representative drove by the Facility and observed process equipment, materials and vast piles of recycled metals on exposed soil, completely uncontained, and un-covered.  On January 9, 2018, during a period of heavy rainfall, the same CEPA representative visited the Facility and took pictures of these conditions, which had not been rectified. The metal piles were exposed to rain, thus likely leaching pollutant metals into the storm water, and thereby nearby water systems.

3. *Failure to Upload a Level 2 ERA Action Plan*

Pursuant to Section XII.D.1.a of the General Permit: "Dischargers with Level 2 status shall certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during which the NAL exceedance(s) occurred. For each new Level 2 NAL exceedance, the Level 2 Action Plan will identify which of the demonstrations in subsection D.2.a through c the Discharger has selected to perform. A new Level 2 NAL exceedance is any Level 2 NAL exceedance for 1) a new parameter in any drainage area, or 2) the same parameter that is being addressed in an existing Level 2 ERA Action Plan in a different drainage area."

On July 1, 2017, the Facility entered Level 2 status for Aluminum and Iron.  As of the date of this Notice, the Discharger has failed to upload into the SMARTS system a Level 2 ERA Action Plan for the facility.


**S I N H A**
**L A W**

4.    *Failure to Update SWPPP*

Pursuant to Section XII.C.2.a of the General Permit, a Discharger shall "as soon as practicable but no later than January 1 following commencement of Level 1 status: i. Revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation."

The Discharger's January 25, 2017, Level 1 ERA Report identified the following issues with the Facility's current SWPPP it uploaded on August 13, 2015:

Based on the pollutant source evaluation and evaluation of existing BMPs implemented at the site, the following additional BMPs or improvements to existing BMPs will be implemented to control pollutants generated from on-site industrial activities. The SWPPP for the site will be revised to reflect the additional BMPs identified below.

| Additional BMP (to reduce Iron/Aluminum) | Date | SWPP Section |
|---|---|---|
| *Divert stormwater runoff away from internal roads and metals storage piles by re-grading soil surfaces.* | *October 21, 2016* | *Section 3* |
| *Addition of large diameter road base rock to all exposed soil surfaces where industrial activities occur to minimize sediment and silt exposure to runoff.* | *October 28, 2016* | *Section 3* |
| *Perform sediment cleanout maintenance of StormFilter Vault and Secondary Settling Vault. Inspect filter cartridges to evaluate need for media replacement.* | *October 28, 2016* | *Section 3* |
| *Remove old rusty equipment and materials or protect from stormwater exposure.* | *October 28, 2016 Ongoing as feasible* | *Section 3* |
| *Store grindings, shavings, and small particle size metals in solid bins under covered areas.* | *October 14, 2016* | *Section 3* |
| *Replace mesh coverings over three (3) DI grates, encircle DI's with fiber rolls and petroleum hydrocarbon specific rolls. Secure in place with outer ring of washed base rock to act as pre-filter and ensure water cannot go under layers of rolls.* | *November 4, 2016* | *Section 3* |

As of the date of this Notice, the Discharger has failed to update its SWPPP according to the requirements of the General Permit.



5.      *Discharges in Violation of the General Permit*

Section 402(p) of the Clean Water Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit such as the General Permit. 33 U.S.C. § 1342.   Sections I.C.27 and III.A and B of the General Permit prohibit the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States. Section XXI.A of the General Permit requires Dischargers to comply with effluent standards or prohibitions established under section CWA 307(a) for toxic pollutants within the time provided in the regulations that establish these standards or prohibitions.

Sections III and VI of the General Permit prohibit storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment; cause or threaten to cause pollution, contamination, or nuisance; cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water; violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans) or statewide water quality control plans and policies; or contain hazardous substances equal to or in excess of a reportable quantity listed in 40 Code of Federal Regulations sections 110.6, 117.21, or 302.6.

West Coast Metals' sampling and analysis results reported to the RWQCB confirm discharges of specific pollutants and materials other than storm water, in violation of the General Permit provisions listed above.  Self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil,* 813 F.2d 1480, 1492 (9th Cir. 1988).

Table 2 of the General Permit (TABLE 2: *Parameter NAL Values, Test Methods, and Reporting Units*) outlines specific Annual and Instantaneous Numeric Action Levels ("NALs) for common parameters.  A copy of Table 2 is included with this Notice.

West Coast Metals' storm water analyses as indicated below contained levels for tested parameters in excess of Annual or Instantaneous NAL levels.  The discharges of pollutants from the Facility have violated Discharge Prohibitions and Receiving Water Limitations of the General Permit and are evidence of ongoing violations of Effluent Limitations.



| Date of Sample Collection | Drainage Collection Point | Parameter | Concentration in Discharge (mg/L) | NAL Annual Average Value (mg/L) |
|---|---|---|---|---|
| 01/13/16 | WC1 | Iron | 5.4 | 1.0 |
| 01/13/16 | WC1 | Aluminum | 2.9 | 0.75 |
| 11/23/16 | WC1 | Iron | 1.2 | 1.0 |
| 12/14/16 | WC1 | Iron | 17.0 | 1.0 |
| 12/14/16 | WC1 | Aluminum | 6.2 | 0.75 |
| 12/14/16 | WC1 | Zinc | 2.3 | 0.26 |
| 03/06/17 | WC1 | Iron | 9.3 | 1.0 |
| 03/06/17 | WC1 | Aluminum | 3.7 | 0.75 |
| 03/06/17 | WC1 | Zinc | 0.78 | 0.26 |

The Discharger may have had other violations that can only be fully identified and documented once discovery and investigation have been completed. Hence, to the extent possible, CEPA includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

The violations discussed herein are derived from eye witness reports and records publicly available. These violations are continuing.

The Facility is located near Pruitt Creek, which is a tributary of both the Laguna de Santa Rosa and the Russian River – all waters of the United States. The Russian River is listed under the CWA as impaired for Nutrients (D.O., Nitrogen, Phosphorous), Pathogens (Indicator Bacteria), Metals (Mercury), Misc. (Temperature), and Sediment (Siltation). Receiving water concerns for the Facility are nitrogen, zinc, aluminum, lead, iron, chemical oxygen demand, phosphorous and sediment. All illegal discharges and activities described in this Notice occur in close proximity to the above-identified waters. During storm events, the discharges are highly likely to discharge to said waters.

The RWQCB has determined that the watershed areas and affected waterways identified in this Notice are beneficially used for: water contact recreation, non-contact water recreation, fish and wildlife habitat, preservation of rare and endangered species, fish migration, fish spawning, navigation, and sport fishing. Information available to CEPA indicates the continuation of unlawful discharges of pollutants from the Facility into waters of the United States, specifically the Laguna de Santa Rosa and the Russian River, in violation of the General Permit and the CWA. CEPA is informed and believes, and on such information and belief alleges, that these illegal discharges will continue to harm beneficial uses of the above-identified waters until the Discharger corrects the violations outlined in this Notice.



### III.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The entities responsible for the alleged violations are (a) West Coast Metals ("the Discharger"), including its parent companies, owners, operators and employees responsible for compliance with the CWA; and (b) Shiloh Road, LLC, the property owner.

### IV.    THE LOCATION OF THE VIOLATIONS

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is West Coast Metals' permanent facility address of 470 Caletti Avenue in Windsor, California, and includes the adjoining navigable waters of the Laguna de Santa Rosa and the Russian River, respectively - both waters of the United States.

### V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is from at least January 13, 2016, to the date of this Notice.  CEPA may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

### VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is the California Environmental Protection Association ("CEPA").

To ensure proper response to this Notice, all communications should be addressed as follows:

*Xhavin Sinha, Attorney for*
*CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION*
*1645 Willow Street, #150*
*San Jose, CA  95125*
*Telephone: (408) 791-0432*
*Email:* xsinha@sinha-law.com



## VII.    PENALTIES

The violations set forth in this Notice affect the health and enjoyment of members of CEPA who reside near and recreate in the Laguna de Santa Rosa watershed and the Russian River. Members of CEPA use the watershed and the Russian River for recreation, sports, fishing, swimming, hiking, photography, nature walks and the like. Their health, use and enjoyment of this natural resource is specifically impaired by the Discharger's violations of the CWA as set forth in this Notice.

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).  An action for injunctive relief under the CWA is authorized by 33 U.S.C. §1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day/per violation for all violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  See also 40 C.F.R. §§ 19.1-19.4.

CEPA believes this Notice sufficiently states grounds for filing suit in federal court under the "citizen suit" provisions of CWA to obtain the relief provided for under the law.

## VIII.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. CEPA encourages the Discharger and/or its counsel to contact CEPA or its counsel within 20 days of receipt of this Notice to initiate a discussion regarding the violations detailed herein.

During the 60-day notice period, CEPA is willing to discuss effective remedies for the violations, however, if the Discharger wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.  CEPA reserves the right to file a lawsuit if discussions are continuing when the notice period ends.

Very truly yours,

Xhavin Sinha
Attorney for CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION

Enclosure
TABLE 2 – Parameter NAL Values, Test Methods and Reporting Units



Copies to:

Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Jeff Sessions, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Regional Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Executive Officer
North Coast Regional Water Quality Control Board
5550 Skylane Boulevard, Suite A
Santa Rosa, CA 95403

Industrial General Permit Order

**TABLE 2:** Parameter NAL Values, Test Methods, and Reporting Units

| PARAMETER | TEST METHOD | REPORTING UNITS | ANNUAL NAL | INSTANTANEOUS MAXIMUM NAL |
|---|---|---|---|---|
| pH* | See Section XI.C.2 | pH units | N/A | Less than 6.0 Greater than 9.0 |
| Suspended Solids (TSS)*, Total | SM 2540-D | mg/L | 100 | 400 |
| Oil & Grease (O&G)*, Total | EPA 1664A | mg/L | 15 | 25 |
| Zinc, Total (H) | EPA 200.8 | mg/L | 0.26** | |
| Copper, Total (H) | EPA 200.8 | mg/L | 0.0332** | |
| Cyanide, Total | SM 4500–CN C, D, or E | mg/L | 0.022 | |
| Lead, Total (H) | EPA 200.8 | mg/L | 0.262** | |
| Chemical Oxygen Demand (COD) | SM 5220C | mg/L | 120 | |
| Aluminum, Total | EPA 200.8 | mg/L | 0.75 | |
| Iron, Total | EPA 200.7 | mg/L | 1.0 | |
| Nitrate + Nitrite Nitrogen | SM 4500-NO3- E | mg/L as N | 0.68 | |
| Total Phosphorus | SM 4500-P B+E | mg/L as P | 2.0 | |
| Ammonia (as N) | SM 4500-NH3 B+ C or E | mg/L | 2.14 | |
| Magnesium, total | EPA 200.7 | mg/L | 0.064 | |
| Arsenic, Total (c) | EPA 200.8 | mg/L | 0.15 | |
| Cadmium, Total (H) | EPA 200.8 | mg/L | 0.0053** | |
| Nickel, Total (H) | EPA 200.8 | mg/l | 1.02** | |
| Mercury, Total | EPA 245.1 | mg/L | 0.0014 | |
| Selenium, Total | EPA 200.8 | mg/L | 0.005 | |
| Silver, Total (H) | EPA 200.8 | mg/L | 0.0183** | |
| Biochemical Oxygen Demand (BOD) | SM 5210B | mg/L | 30 | |

SM – Standard Methods for the Examination of Water and Wastewater, 18th edition
EPA – U.S. EPA test methods
(H) – Hardness dependent
* Minimum parameters required by this General Permit
**The NAL is the highest value used by U.S. EPA based on their hardness table in the 2008 MSGP.